1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    THOMAS JOHN HEILMAN,                          No.  2:12-cv-01966 JAM AC P

12              Plaintiff,

13        v.                                        ORDER and

14    TODD WASKO, et al.,                           FINDINGS AND RECOMMENDATIONS

15              Defendants.

16

17    I.  Introduction

18          Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

19    action filed pursuant to 42 U.S.C. § 1983.  At all relevant times, plaintiff was incarcerated at the

20    California Medical Facility (CMF), under the authority of the California Department of

21    Corrections and Rehabilitation (CDCR).  Plaintiff is currently incarcerated at the California

22    Men's Colony in San Luis Obispo.

23          This action proceeds on plaintiff's original complaint filed July 26, 2012, as narrowed by

24    the court's rulings on defendant's motion to dismiss.  See ECF Nos. 32, 36.  Plaintiff's only

25    remaining claim is that defendant Todd Wasko, Correctional Counselor I (CC-I or CCI), violated

26    plaintiff's First Amendment rights by issuing a CDCR Form 115 Rules Violation Report (RVR)

27    against him on October 28, 2011, in retaliation for plaintiff succeeding on a previous

28    administrative grievance against him.  The grievance, filed September 5, 2008, challenged the

1

duration of time defendant had provided plaintiff to conduct an <u>Olson</u> review[1] of his central file.[2]

Currently pending are the parties' cross-motions for summary judgment.[3]   ECF Nos. 95, 97.  This action is referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), Local Rule 302(c), and Local General Order No. 262.  For the reasons that follow, this court recommends that plaintiff's motion for summary judgment be denied, and defendant's motion for summary judgment be granted.

II. <u>Legal Standards</u>

A. <u>Legal Standards for Summary Judgment Motions</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the

---

[1]  <u>See</u> <u>In re Olson</u>, 37 Cal. App. 3d 783 (1974) (recognizing the right of California inmates to inspect all nonconfidential records maintained in their central and medical files).

[2]  Because the allegedly retaliatory RVR issued by defendant was later reduced to a CDC 128-A counseling chrono, there was no disciplinary adjudication affecting good time credits.  The "favorable termination rule" of <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994) and <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997), therefore does not bar plaintiff's claim.

[3]  Plaintiff filed his motion for summary judgment on February 17, 2015, ECF No. 95.  Defendant filed an opposition, ECF No. 99; plaintiff filed a reply, ECF No. 101.  Defendant filed his motion for summary judgment on March 2, 2015.  ECF No. 97.  Plaintiff filed an opposition (combined with his reply brief to his own motion), ECF No. 101; defendant filed a reply, ECF No. 103.  Plaintiff thereafter filed a notice of return from out-of-court status and submission of additional evidence, ECF No. 106, and a response to defendant's statement of undisputed facts, ECF No. 107.  In light of plaintiff's out-of-court status requiring belated additional briefing, and defendant's non-opposition thereto, the substance of these filings has been included in the court's consideration of the parties' cross-motions.

1   adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ.

2   P. 56(c)(1)(A), (B).

3    When the non-moving party bears the burden of proof at trial, "the moving party need

4   only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle

5   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

6   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

7   against a party who fails to make a showing sufficient to establish the existence of an element

8   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

9   Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

10  nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

11  circumstance, summary judgment should be granted, "so long as whatever is before the district

12  court demonstrates that the standard for entry of summary judgment ... is satisfied."  Id. at 323.

13   If the moving party meets its initial responsibility, the burden then shifts to the opposing

14  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

15  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

16  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

17  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

18  admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

19  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  Moreover, "[a] Plaintiff's verified complaint

20  may be considered as an affidavit in opposition to summary judgment if it is based on personal

21  knowledge and sets forth specific facts admissible in evidence."  Lopez v. Smith, 203 F.3d 1122,

22  1132 n.14 (9th Cir. 2000) (en banc).[4]

23  _____

24  [4]  In addition, in considering a dispositive motion or opposition thereto in the case of a pro se
    plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's
25  verified complaint or opposition.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)
    (evidence which could be made admissible at trial may be considered on summary judgment); see
26  also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district
    court abused its discretion in not considering plaintiff's evidence at summary judgment, "which
27  consisted primarily of litigation and administrative documents involving another prison and
    letters from other prisoners" which evidence could be made admissible at trial through the other
28  (continued…)

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U .S. at 587 (citations omitted).

In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. …  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

In applying these rules, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  However, "[if] a party fails to properly

inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

4

1  support an assertion of fact or fails to properly address another party's assertion of fact, as

2  required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion

3  ….." Fed. R. Civ. P. 56(e)(2).

4      B. Legal Standards for First Amendment Retaliation Claim

5      "Within the prison context, a viable claim of First Amendment retaliation entails five

6  basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

7  because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

8  exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

9  correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (fn. and citations

10  omitted).

11      Under the first element, plaintiff need not prove that the alleged retaliatory action, in

12  itself, violated a constitutional right.  Pratt v. Rowland, 65 F.3d 802, 806 (1995) (to prevail on a

13  retaliation claim, plaintiff need not "establish an independent constitutional interest" was

14  violated); see also Hines v. Gomez, 108 F.3d 265, 268 (9th Cir.1997) (upholding jury

15  determination of retaliation based on filing of a false rules violation report); Rizzo v. Dawson,

16  778 F.2d 527, 531 (transfer of prisoner to a different prison constituted adverse action for

17  purposes of retaliation claim).  The interest cognizable in a retaliation claim is the right to be free

18  of conditions that would not have been imposed but for the alleged retaliatory motive.

19      To prove the second element, retaliatory motive, plaintiff must show that his protected

20  activities were a "substantial" or "motivating" factor behind the defendant's challenged conduct.

21  Brodheim v. Cry, 584 F.3d 1262, 1269, 1271 (9th Cir. 2009).  Plaintiff must provide direct or

22  circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is not

23  sufficient.  See McCollum v. CDCR, 647 F.3d 870, 882-83 (9th Cir. 2011); accord, Wood v.

24  Yordy, 753 F. 3d 899, 905 (9th Cir. 2014).  In addition to demonstrating defendant's knowledge

25  of plaintiff's protected conduct, circumstantial evidence of motive may include:  (1) proximity in

26  time between the protected conduct and the alleged retaliation; (2) defendant's expressed

27  opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for

28  the challenged action were false or pretextual.  McCollum, 647 F.3d at 882.

1    The third element includes prisoners' First Amendment right to access to the courts.

2    Lewis v. Casey, 518 U.S. 343, 346 (1996).  While prisoners have no freestanding right to a prison

3    grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's

4    fundamental right of access to the courts hinges on his ability to access the prison grievance

5    system," Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), overruled on other grounds by

6    Shaw v. Murphy, 532 U.S. 223, 230 n.2 (2001).  Because filing administrative grievances and

7    initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate

8    against prisoners for engaging in these activities.  Rhodes, 408 F.3d at 567-68.  Protected speech

9    also includes an inmate's statement of intent to pursue an administrative grievance or civil

10   litigation.  See West v. Dizon, 2014 WL 794335, *6 (E.D. Cal., Feb. 27, 2014) (collecting cases).

11   Under the fourth element, plaintiff need not demonstrate a "total chilling of his First

12   Amendment rights," only that defendant's challenged conduct "would chill or silence a person of

13   ordinary firmness from future First Amendment activities."  Rhodes, 408 F.3d at 568-69 (citation

14   and internal quotation marks omitted).  Moreover, direct and tangible harm will support a

15   retaliation claim even without demonstration of a chilling effect on the further exercise of a

16   prisoner's First Amendment rights.  Id. at 568 n.11.  "[A] plaintiff who fails to allege a chilling

17   effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse

18   action.  Brodheim, 584 F.3d at 1269 (citing Rhodes, 408 F.3d at 568 n.11).

19   Regarding the fifth element, the Ninth Circuit has held that "preserving institutional order,

20   discipline, and security are legitimate penological goals that, if they provide the motivation for an

21   official act taken, will defeat a claim of retaliation."  Barnett v. Centoni, 31 F.3d 813, 816 (9th

22   Cir. 1994); Rizzo, 778 F.2d at 532.  When considering this final factor, courts should "'afford

23   appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate

24   penological reasons for conduct alleged to be retaliatory."  Pratt, 65 F.3d at 807 (quoting Sandin

25   v. Conner, 515 U.S. 472, 482 (1995)).  Plaintiff bears the burden of pleading and proving the

26   absence of legitimate correctional goals for defendant's challenged conduct.  Pratt, 65 F.3d at

27   806.

28

6

1  III. Facts

2      The following summary identifies relevant disputed and undisputed facts as agreed to by

3  the parties[5]  or as determined by the court based on a thorough review of the record.

4    • Plaintiff Thomas Heilman is a state prisoner who was incarcerated at CMF during all

5      relevant times.

6    • Defendant Todd Wasko was employed at CMF as a CC-I during all relevant times.

7    • A General Chrono CDCR Form 128-B "is used to document information about inmates

8      and inmate behavior."  Cal. Code Regs. tit. 15, § 3000.  A Form 128-B is used for specific

9      incidents "when the subject matter to be reported involves matters of classification [or]

10     parole."  Department Operations Manual (DOM) § 72010.7.2.

11   • A Custodial Counseling Chrono CDCR Form 128-A is used by staff to record minor

12     inmate misconduct.  Cal. Code Regs. tit. 15, § 3312(a)(2); DOM § 72010.7.1.

13   • A Rules Violation Report (RVR) CDCR Form 115 is used by staff to record serious

14     misconduct or violations of law by inmates.  Cal. Code Regs. tit. 15, § 3312(a)(3); DOM §

15     72010.5.

16   • Inmates must refrain from behavior which might lead to violence or disorder, or otherwise

17     endanger the facilities or other persons.  See Cal. Code Regs. tit. 15, § 3005.

18   • In May 2008, plaintiff was housed at CMF's Enhanced Outpatient Program (EOP) and

19
20  [5]  Pertinent to plaintiff's motion for summary judgment are Plaintiff's Statement of Undisputed Facts, ECF No. 95 at 65-82; Defendant's Statement of Disputed Facts, ECF No. 99-1; and Defendant's Responses to Plaintiff's Statement of Undisputed Facts, ECF No. 99-3.  Pertinent to
21  defendant's motion for summary judgment are Defendant's Statement of Undisputed Facts, ECF No. 97-3; and Plaintiff's Response to Defendant's Statement of Undisputed Facts, ECF No. 107
22  at 1-14.  The court has considered all exhibits submitted in support of each statement, including the transcript of plaintiff's June 18, 2014 deposition, see ECF No. 98, and the December 1, 2011
23  Confidential Supplement ("Attachment C") to Plaintiff's Appeal Log No. CMF-M-11-1341, see
24  ECF No. 118.
     Defendant moves to strike several of plaintiff's proffered undisputed facts on the ground that
25  they rely on evidence plaintiff initially failed to submit to the court (specifically, Defendant's Response to Plaintiff's Requests for Admissions, Set Two).  See ECF No. 99-2.  However,
26  plaintiff thereafter submitted a copy of this discovery with his notice of return from out-of-court status, see ECF No. 106, which the court has deemed timely filed, see n.2, supra.  Therefore,
27  defendant's motion to strike will be denied as moot.

28

assigned to defendant's caseload.  Consistent with his normal practice of reviewing the central files of all inmates assigned to his caseload, defendant reviewed plaintiff's central file and learned that plaintiff was serving a sentence for first degree murder.  Wasko Decl. ¶¶ 7-8.

- On August 29, 2008, plaintiff came to defendant's office for a scheduled Olson Review of plaintiff's central file.  Defendant states that he allowed plaintiff "the amount of time that I could, in keeping with my other responsibilities for that day, which was around forty-five minutes.  [¶]  There is no set time to provide an inmate during an Olson review. . . . [¶] I asked plaintiff to sign a CDCR Form 128-B prior to conducting the Olson review to record that he was given the opportunity.  I did not force or pressure plaintiff to sign this document."  Wasko Decl. ¶¶ 10-2; see also Df. Ex. B-1 (subject form signed by plaintiff).

- On September 5, 2008, plaintiff filed an Administrative Appeal CDCR Form 602, Log No. CMF-08-03113.  Plaintiff requested that his appeal be construed as a staff complaint against defendant Wasko; the request was denied.  Plaintiff complained that defendant accorded him only thirty minutes to review his central file, and required that plaintiff sign the Form 128-B before he could view his file.  Plaintiff asserted that when he asked defendant for additional time, defendant told plaintiff "to file a staff complaint 602 appeal for more viewing time and another Olson review."  See ECF No. 107 at 32; see also id. at 26-31, 34.  Plaintiff avers that when he told defendant of his "intention to file an appeal," Wasko replied, "'Go ahead, you'll lose anyway!'"  ECF No. 107 at 5, ¶ 18.

- Plaintiff's appeal was granted at the First Level Review.  Plaintiff was accorded additional time, by another staff member, to review his file on November 21, 2008, which plaintiff reportedly found adequate.  See ECF No. 107 at 33 (First Level Response); see also id. at 26-35 (Pl. Ex. 3).

- The parties dispute when defendant became aware that plaintiff had challenged defendant's conduct in his Appeal Log No. CMF-08-03113.  Plaintiff did not personally inform defendant that he filed the appeal.  See Pl. Depo., 18:4-6; see also ECF No. 107 at 5, ¶ 18.  However, plaintiff states that "per CDCR policy the Def. would have been

interviewed concerning Heilman's allegations prior to the 'granting' of Heilman's appeal."  ECF No. 107 at 6, ¶ 19.

- Defendant does not recall when he first learned about plaintiff's 2008 appeal, but believes that "the staff member who reviewed plaintiff's grievance inquired with me about how long plaintiff was permitted to review his central file."  Wasko Decl. ¶ 13.  The appeal itself indicates that, on September 23, 2008, pursuant to Informal Review, CC-II Taylor noted that "CC I Wasko has advised me that you were afforded 45 minutes to review your C-file. . . ."  ECF No. 107 at 26.

- The parties did not interact again until more than a year later, at plaintiff's annual classification review on December 10, 2009.  Defendant contends that plaintiff's behavior was disruptive and documented his observations in a Form 128-B (entitled "Conduct Which Could Lead to Violence") prepared the same date.[6]  See ECF No. 97-6 at 16, Df. Ex. B-2.  Defendant stated therein that plaintiff was "verbally abusive and hostile towards several staff members," including Correctional Officer (CO) Dawson.  Id.  When defendant informed plaintiff that the hearing was "non-adverse," plaintiff waived his right to a 72-hour notice and decided to proceed with the hearing.  However, plaintiff thereafter asked, "What's he [Wasko] doing here?  I don't want him here he's a piece of shit;" and disobeyed defendant's direct orders to sit down, telling defendant "No, I'm not going to sit down, I don't like you either, Wasko, and I don't want you doing my [Parole] Board Report."  Id.  Only after Captain Taylor told officers to take plaintiff back to his cell did plaintiff become cooperative.  Defendant opined that "[t]he situation clearly warranted

---

[6]  Plaintiff asserts throughout his briefing that defendant violated CDCR regulations and the Department Operations Manual (DOM) by recording alleged inmate misconduct on a General Chrono Form 128-B, rather than a Custodial Counseling Chrono Form 128-A.  Plaintiff also asserts that defendant violated CDCR regulations and the DOM by secretly placing three Forms 128-B in plaintiff's central file without providing plaintiff notice and a timely opportunity to respond.  However, the alleged failure of officials to follow state prison regulations and procedures does not state a federal civil rights violation under Section 1983.  See e.g. Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997).  Moreover, the undersigned finds that the date on which plaintiff became aware of the forms is immaterial to the substance of the parties' pending motions.

staff to use force on Heilman to gain compliance with several lawful orders, which Heilman ignored.  All staff members present exercised a tremendous amount of patience and self-restraint in this situation avoiding the use of force on I/M Heilman."  Id.

- Plaintiff asserts that he exhibited no improper behavior at the hearing.  See ECF No. 107 at 6, ¶ 21.  At his deposition, plaintiff testified that defendant's accusations are "outrageous.  It would never happen in a CDC type of environment."  Pl. Depo. at 27:13-4.  Plaintiff contends that defendant's alleged fabrication is supported by the fact that the Form 128-G Chrono memorializing the December 10, 2009 review does not list CO Dawson in attendance.  Pl. Depo. at 25:7-8; Compl., ECF No. 1 at 14, ¶ 10; id. at 48, Pl. Ex. B.  However, the court notes that the identified staff participants are not necessarily exclusive and the review summary indicates that plaintiff "initially refused to participate in this committee."[7]  ECF No. 1 at 48, Pl. Ex. B.

- The parties did not interact again for more than a year-and-a-half, on July 18, 2011.  In the interim, defendant Wasko scheduled an Olson review for plaintiff on February 2, 2010, in anticipation of a parole hearing; plaintiff declined the opportunity to review his central file.  See Cervantez Decl., ECF No. 99-4 at 1-3; Df. Ex. C-1.

- On July 18, 2011, plaintiff reported to defendant's office to conduct a prescheduled telephonic court conference in plaintiff's unrelated superior court case.[8]  Defendant contends that plaintiff's behavior was so disruptive that another officer was required to facilitate the conference.  Defendant documented his observations in a General Chrono

---

[7]  The summary of plaintiff's December 10, 2009 annual review indicates in pertinent part, ECF No. 1 at 48 (Pl. Ex. B):

> Subject did not receive 72 hours advance notice per C.C.R. 3375(f)(1), and Subject initially refused to participate in this committee.  When he was informed that this committee was non-adverse in nature he agreed to waive his 72-hours notice and proceed.

[8]  Telephonic conferences were scheduled in plaintiff's action filed in the Solano County Superior Court, in Heilman v. Sanders, M.D., Case No. FCS 034431.  See ECF No. 107 at 8; see also Compl., ECF No. 1 at 55-6.

Form 128-B (entitled "Disruptive Behavior") prepared on July 20, 2011, which provides in part, ECF No. 97-6 at 17, Df. Ex. B-3:

> On Monday 7/18/2011, at approximately 0810 hours Inmate Heilman [] reported to my office in L-2 to conduct a prescheduled court call. Prior to Heilman's arrival, I prepared a desk and chair for him to sit at . . . [and] moved the phone to the area. . . . Upon Heilman's arrival to my office, I said good morning and asked Heilman how he was doing. Heilman, in an aggressive, agitated tone began complaint that we (CMF Staff) have been making his court calls as difficult as possible and that he had filed a complaint with the courts. Heilman further informed me that the complaint was directed specifically at me. I informed Heilman that I have been absent from the institution for most of the last month, making it impossible for me to personally be present during his calls, but that I had made every attempt possible when I was here, to ensure that his court calls were handled with another staff member. Heilman appeared unsatisfied with my response and again informed me that he had filed a complaint with the court against me. . . . [Plaintiff] pulled out a piece of paper and showed me a list, with numerous inmate's [sic] names on it. Heilman told me that I needed to ducat the inmates on the list on his behalf, so that he could conduct a conference with them and advise them of the outcome on a group appeal. I told Heilman that I wasn't sure exactly how that situation should be handled, but I'd look into it. . . . Heilman then yelled out, "You don't have to do anything, just like you never did, but the court will deal with you." At this point I informed Heilman that I did not want to talk to him anymore, and I instructed him to be quiet and sit at the desk I'd set up for him and waif for his court call. . . . Heilman immediately rose to his feet, flung my office door open and began yelling down the tier for the Wing Officers to come to his assistance. As Correctional Officer R. Franco responded to the scene, Heilman told him that I was harassing him and that he needed a witness. In an effort to avoid any further escalation of the brewing hostility with Heilman, I advised him that due to his disruptive argumentative behavior, I would not be conducting his court call today. I then ordered him to return to his assigned wing. C/O Franco escorted Heilman out of the wing. At approximately 0830, I got a call from Facility B Lieutenant Torres [i]nquiring about the situation. I filled him in on the details . . . . I informed Lt. Torres that if he wanted to make the call with Heilman, I would provide him with the information he needed to complete the call. I met Lt. Torres in the Unit II Corridor and provided him with a copy of the Court Call Information sheet. . . . Lt. Torres then took Heilman down the corridor to conduct the call[.]

- Defendant recalls that plaintiff "yelled at me and disobeyed my direct orders to cease his disruptive behavior and calm down. He stood in my office doorway, flung my office door open, and yelled out of my office door. Plaintiff was standing in the doorway, blocking

11

my only means of exit. . . . I believed plaintiff's hostile behavior was escalating and became concerned I could not safely conduct the court call." Wasko Decl. ¶¶ 23-4.

- Plaintiff disputes defendant's characterization of his behavior on July 18, 2011. Plaintiff alleges that, prior to July 18, 2011, defendant refused to conduct court calls assigned to defendant by the Litigation Coordinator. Compl., ECF No. 1 at 15, ¶ 12; Pl. Depo. at 42-3. Plaintiff alleges that when he arrived at defendant's office, "defendant Wasko made direct threats of retaliation to deny plaintiff access to court proceedings if plaintiff did not stop engaging in the activities of filing civil rights litigation in court against fellow CDCR staff members." Id. at 15, ¶ 13. Plaintiff testified at his deposition as follows, Pl. Depo. at 30-1:

> [A]s I got into Mr. Wasko's office he immediately began making claims that I had no right to file lawsuits against prison officials. And . . . he stated that he should not be the one to facilitate court calls or any type of action against prison officials. At which point I pulled the court order out of my folder and showed it to him that I have the right to conduct this court call, to which T. Wasko went ballistic. . . . He began hollering at the top of his lungs, "You think you're so smart. You think you're so smart. I'm not going to do your court call. How do you like that? Ha, ha, ha. Get out of my office. Get out, get out."

- Plaintiff testified that he opened the door and contacted CO Franco, who "was right outside the door" because his office was across from defendant's office, and asked Franco to supervise his call. Franco agreed. Id. at 31-2, 39-40. However, defendant insisted that plaintiff be returned to his cell and then called the lieutenant. Thereafter, plaintiff was questioned by the lieutenant and four or five other correctional officers; the lieutenant decided to monitor the call. Id. at 32.

- Plaintiff alleges that the following day, defendant's immediate supervisor, D. Haley, CC-II, "burst" into plaintiff's cell and "berated" plaintiff for complaining about defendant to Lt. Torres and other CMF administrators, "implying" that plaintiff's future calls may be withheld in retaliation for plaintiff pursuing civil rights litigation against prison staff. Compl., ECF No. 1 at 16-7, ¶ 14-6; see also Pl. Depo. at 41-2, 44-5, 47. Plaintiff relies on an affidavit submitted by another prisoner in plaintiff's superior court case as evidence of

plaintiff's calm demeanor in response to CC Haley's statements.[9]  See ECF No. 107 at 6-8, ¶ 23.

• Defendant states that he was not aware until this lawsuit that plaintiff submitted documentation to the Solano County Superior Court challenging defendant's conduct regarding plaintiff's July 18, 2011 court call.  Wasko Decl. ¶ 27.

• The parties did not interact again for another three months, on October 28, 2011.  In the interim, on August 10, 2011, defendant received an email from the CMF Litigation Coordinator advising that plaintiff had another court call scheduled for August 22, 2011.  In a General Chrono Form 128-B (entitled "Staff Safety Concerns"), dated August 12, 2011, defendant set forth the following reasons in support of his requests that he not be requiring to facilitate the call or be involved in other matters involving plaintiff, and requested that plaintiff be housed outside of defendant's work area.  See ECF No. 97-6 at 18, Df. Ex. B-4.  Defendant averred in pertinent part, id.:

> I do not feel that I can safely perform the court call or any other functions related to my job in the presence of I/M Heilman.  I have had numerous disruptive incidents with I/M Heilman in the past, but only began documenting the incidents as of 12/2009, when I realized that most encounters I had with Heilman resulted in some kind of commotion.  I have always tried to remain professional and calm when dealing with Hellman, even going out of my way to ensure that Heilman's court calls were handled with other staff when I planned to be away from work.  No matter how much assistance I provide Heilman, whenever he receives an answer from he that he doesn't like, he immediately becomes loud and verbally aggressive.  He often rises to his feet, flailing his arms around and pointing his fingers at me as he threatens to file lawsuits and appeals against me.  Heilman continuously refuses to follow my verbal orders to cease his disruptive behavior.  I have exercised an enormous amount of self-restraint in my dealings with Heilman during his disruptive outbursts.  Even when the use of force was clearly warranted to stop his behavior and gain compliance with the numerous lawful orders I have given him that he failed to follow, I

_____

[9]  Plaintiff relies on a sworn declaration by inmate M. Nida, which avers in pertinent part that Nida witnessed, on July 19, 2011 (sic), CC Haley "loud and angrily confront" plaintiff "about a situation in which Counselor Wasko, CC-I, refused to allow Inmate Heilman to phone the court. . . . Inmate Heilman reacted calmly and coolly towards CC-II Haley's verbal outburst . . . ."  See ECF No. 1 at 53.  This affidavit is not only inadmissible hearsay, see Fed. R. Evid. 801, 802, but irrelevant to plaintiff's interactions with defendant.

13

refrained from using force.  Heilman has told me before that he does not like me and his behavior towards me is a clear indicator of that.  Considering Heilman's commitment offense for PC 187 Murder 1° combined with his mental health issues, and obvious animosity towards me, I am requesting that Heilman be moved to an EOP bed that is not in my immediate work area which consists of L-2, L-3, and N-2.  I do not feel safe in the presence of Heilman, and in the interest of institutional safety and security, for both myself and I/M Heilman, I recommend that this request be granted.

- On October 21, 2011, during the period between the parties' direct interactions on July 18, and October 28, 2011, plaintiff conducted another Olson review of his central file. Plaintiff states that pursuant to this review he discovered, for the first time, each of the three above-noted 128-B Chronos prepared by defendant.  Plaintiff alleges that defendant prepared each chrono in retaliation for plaintiff's success utilization of the prison grievance process and in pursuing civil rights litigation against prison staff, as well as to deter such conduct by plaintiff in the future, and to impair plaintiff's parole eligibility. Plaintiff also alleges that defendant placed each chrono in plaintiff's central file without providing him notice, thus depriving plaintiff of the opportunity to challenge their validity.  See n.5, supra.

- On the morning of October 28, 2011, the parties encountered each other in a CMF hallway.  In an undated "Correctional Employee Multi-Purpose Work Sheet 115/128," defendant wrote in pertinent part, ECF No. 97-6 at 19, Df. Ex. B-5 (original emphasis):

> On Friday 10/28/2011, at approximately 910 hours I was walking down the second floor corridor from the Unit II Grill Gate towards the L-2 Housing unit while pushing my cart full of c-files. . . . While glancing over my right shoulder into the I-2 Housing unit, in my peripheral vision, I noticed an unidentified individual off to my right and approximately 20 feet behind me, advancing on me at an accelerated pace. . . .[A]s I took a few more steps I again turned my head to the right just to make sure that I wasn't in danger.  As I looked again the individual was right behind me just a little to my right. . . . I spotted and turned to the right to face the Subject and place myself in a better position to defense myself if I needed to.  As I looked at the individual I discovered that it was Inmate Heilman []. . . . [H]e slowed his pace to a really show walk, moving to his right, around me while looking directly in my eyes and laughing and shaking his head from side to side. . . . When he got approximately ten feet from me he said something to me that I wasn't able to understand. . . . I told Heilman . . . that he'd better watch his step and that he was lucky that I didn't request that he be

14

transferred previously.  Heilman responded by elevating his voice and aggressively saying, "No, you better watch your step." . . . I believe Heilman's behavior towards me is escalating to the point that a violent confrontation between us is imminent.  [¶]  I have previously documented disruptive threatening behavior by Heilman towards me (128B's 12/10/09, 7/18/11, 8/10/11) and requested that he be removed from my caseload in an effort to eliminate any potential future hostilities. . . . [M]y concerns were not taken seriously and it now appears that my initial concerns were underestimated as Heilman thinks that stalking me and advancing aggressively towards me in the hallway is acceptable and tolerable behavior.  Heilman's actions this morning were an obvious attempt to intimidate me at the minimum. . . . [and] have convinced me that he **is a threat to my safety** and the only way to eliminate that threat is to transfer him.   Therefore, I am requesting that Heilman be placed into administrative segregation and retained in administration until he can be transferred to another institution.  **I absolutely do not feel that I can safely perform my duties at CMF with Inmate Heilman walking the mainline.**  I have unsuccessfully made every attempt I can possibly make to avoid future conflicts which I've been trying to avoid.  Considering the recent CMF/EOP conversion of L-Tower to a DMH-ICF program, which requires reduction of the current EOP population, it appears an opportune time to transfer Heilman.

- Defendant concluded with the following statements in this Work Sheet 115/128, ECF No. 97-6 at 19, Df. Ex. B-5:

  Heilman is almost notorious at CMF for his ability to win appeals on the RVR's that he receives.  Heilman's EOP level of care is almost deceiving, considering the level of intelligence he possesses, which is clearly displayed in the lawsuits and appeal papers that he continuously files.

- Defendant's allegations were later set forth in a CDCR Form 115 RVR signed by defendant on November 2, 2011.  See ECF No. 107 at 39, 45.  A Mental Health Assessment determined that plaintiff's mental health did not contribute to the challenged behavior and so he should be held accountable.[10]  Plaintiff was provided a copy of the RVR and other documents on November 3, 2011.

---

[10]  An inmate's mental health and comprehension of the disciplinary process is important in adjudicating RVRs.  See e.g. 15 Cal. Code Regs. § 3315(d)(2)(E)(1) (inmates receiving mental health care through, inter alia, the Enhanced Outpatient Program, are ineligible to waive assignment of a staff assistant to assist in the preparation and presentation of a defense at an RVR disciplinary hearing); id., § 3317 (requiring Mental Health Assessment of inmates receiving mental health care before documenting misbehavior on a CDCR Form 115 RVR).

- On November 17, 2011, plaintiff appeared before Senior Hearing Officer (SHO) Correctional Lieutenant D. J. Thomas, with the support of an assigned Staff Assistant. Plaintiff pled not guilty; he stated that he encountered defendant in the hallway while returning to his housing unit from the radiology clinic after obtaining an x-ray of his shoulder.  ECF No. 107 at 40.  Plaintiff's statement provided in pertinent part, id. (original emphasis):

    > I may have walk[ed] upon CCI Wasko he does have hearing aid and he may have been startled. . . . Inmates were mopping the floor. . . . I crossed over the yellow lines, past the 'wet floor' signs and kept walking because of another staff pushing a cart of files in the dry area of the floor by the wall.  I walked past this staff member.  It was Counselor Wasko.  When I walked past Mr. Wasko, I just nodded my head in acknowledgement as he was staring directly at me.  I may have said, "Hey, Wasko," but I'm not sure.  Mr. Wasko immediately told me as I walked past him, "Heilman, I was this close to getting you transferred," while holding up his thumb and forefinger about an inch apart. . . . I kept walking to the N-2 wing after Ms. Wasko['s] comment but over my shoulder I said, "That's retaliation because I wrote to the court about you." . . .  All this occurred in approximately 3 to 5 seconds as we passed each other by chance meeting on the second floor hallway and I DENY all of Mr. Wasko's allegations.

- In a written decision issued January 9, 2012, SHO Thomas found plaintiff guilty of the lesser included offense of "Disrespect Towards Staff," a violation of 15 C.C.R. § 3004(b). ECF No. 107 at 41.  Lt. Thomas noted that "there appears to be a pre-existing adversary relationship between the Subject [plaintiff] and the writer [defendant]."  Id. at 43.  Lt. Thomas concluded that plaintiff "used poor judgment" when he "elected to take advantage of the opportunity to create the element of surprise for staff.  Lt. Thomas was convinced Subject had full knowledge his behavior would produce a startled effect on staff."  Id. The decision was signed by Facility Captain J.R. Walker and CMF Associate Warden D. Arnold on January 11, 2012.  Id. Lt. Thomas separately issued a Form 128-A, see ECF No. 1 at 98, 100, which became the official record of the incident, see id. at 99.

- Meanwhile, on the afternoon of October 28, 2011, and in response to the RVR, plaintiff was placed in the Administrative Segregation Unit (ASU).  ECF No. 1 at 86.  Plaintiff appeared before the Classification Committee on November 2, 2011, which determined

16

that plaintiff would be "retained in ASU pending the adjudication of the RVR and the resolution of staff safety concerns at CMF." Id. This decision was approved November 8, 2011. On December 21, 2011, the Committee – comprised of CMF Warden Singh, CMF Associate Warden Arnold, Facility Captain J. Walker, and Staff Psychologist Dr. Minor (with recorder CC-II J. Zometa) – noted that the RVR had been reduced to a CDC-128A, but concluded that plaintiff should be retained in the ASU for the following reasons, id.:

> Today's committee notes the RVR was reduced to a CDC-128A. Committee addressed staff safety concerns as documented on the CDC-128A and concluded that Subject has demonstrated a pattern of harassment and threatening behavior towards CCI Wasko, the author of the original RVR. Committee also notes [that] CCI Wasko continues to have personal safety concerns with Inmate Heilman, and feels threatened by his presence at CMF. ICC concluded that Inmate Heilman should not be allowed to remain at CMF. Therefore, Committee agreed to retain Subject in ASU due to staff safety concerns and refer the case to the CSR [Classification Staff Representative] for transfer consideration.

> ... Committee Action: Retain ASU based on staff safety concerns at AMF, refer to CSR for adverse transfer to CMCE-III (EOP Psy O/R), with RJD-III (EOP Psy O/R) as ALT, continue MAX Custody to revert to MED-A upon transfer. . . .

- On November 29, 2011, after the RVR hearing but before issuance of the formal decision, defendant emailed CMF CC-II J. Zometa, who worked with the "PSYCH ASU caseload." See ECF No. 1 at 84 (Compl., Ex. H); ECF No. 107 at 50. Defendant stated:

> I'm aware that the RVR against Heilman [] has been reduced to a 128A. [¶] I originally documented this incident on a 128B, however, Captain Walker had me change it to a 115.[11] The fact that the RVR was reduced to a 128A does not change my belief that Heilman is a threat to my safety. Please keep me advised if administration plans to release Heilman from ASU. I want it to be very well known that I do not want him here at CMF on our mainline. I've had way to[o] many conflicts with him. Let me

---

[11] In his answers to interrogatories, defendant stated that "Captain Walker did not pressure the Defendant to change anything. After discussing the incident with Captain Walker, the Defendant, using his own discretion, thought the more appropriate documentation would be a 115 Rules Violation Report given the severity of the incident." See ECF No. 84 at 103 (Defendant's Answer to Plaintiff's Interrogatory Nos. 17 and 18). However, in his declaration, defendant avers that he followed the recommendation of Captain Walker, who was his supervisor. Wasko Decl. ¶ 37.

know if you need any more documents from me.

Id. (original emphasis).  In response to plaintiff's interrogatory asking "who placed [this] email . . . in Heilman's prison Central File so near to his Parole Consideration Hearing," defendant responded that he "has no knowledge who placed the e-mail in the plaintiff's central file."  See ECF No. 84 at 104 (Defendant's Answer to Plaintiff's Interrogatory No. 18).

- Plaintiff was transferred to R.J. Donovan Correctional Facility on January 27, 2012.  See Compl., ECF No. 1 at 30, ¶ 51.  Plaintiff appeared before the Board of Parole Hearings on May 11, 2012.  Id. at ¶ 52.  Plaintiff states that the scheduling of the hearing was delayed due to plaintiff's transfer, and that he was questioned at the hearing about defendant's charges against plaintiff.  Plaintiff was denied parole, and his next hearing was scheduled in five years.  Id.

- Plaintiff challenged the disciplinary hearing and decision on due process grounds, asserting that the alleged due process violations were an attempt to conceal defendant's alleged retaliatory misconduct in filing the underlying false charges against plaintiff.   The appeal was categorized as a "regular disciplinary appeal," not a "staff complaint."  ECF No. 1 at 95.  Plaintiff pursued this matter in an administrative grievance through the Second Level, where it was denied on final review.  See Compl. Ex. K, ECF No. 1 at 89-103.  The Second Level Decision provided in pertinent part, id. at 99:

> It is found that the RVR was issued and adjudicated consistent with the regulatory requirements and that the hearing official's findings were reasonable and the dismissal and recording of the Appellant's behavior on a CDCR-128A is within the purview of a hearing official.  Based on the above review and all factors considered no relief is found to be warranted at the Second Level of Review. Per C.C.R. section 3084.7, this Second Level Review constitutes the department's final action in this matter and exhausts the Appellant's administrative remedies.

- Also pertinent[12] is the December 1, 2011 Confidential Supplement ("Attachment C"), see

---

[12]  The undersigned ordered an in camera review of this document, after finding that it may be "uniquely relevant" to the issues in this case. ECF No. 102 at 21-4. Following in camera review, the court ordered disclosure of the unredacted document to plaintiff upon finding that such (continued…)

ECF No. 109 at 6, prepared by correctional staff in response to plaintiff's staff complaint filed against defendant on November 7, 2011, in Appeal Log No. CMF-M-11-1341. Plaintiff asserted in his complaint that, when he "passed Wasko CC-I in the 2nd Floor Hallway, Wasko made the implied threat that he tried to transfer me for 'personal' reasons." Plaintiff also asserted that defendant's documented allegations against him were false and demonstrated "retaliation and harassment without penological justification." See ECF No. 23-3 at 21-3. Lt. Ross investigated plaintiff's allegations and interviewed both parties. He found no corroboration for plaintiff's allegations and concluded that "[t]here is no evidence CCI Wasko violated any policies or procedures." ECF No. 109 at 6. CMF Warden V. Singh approved the decision on December 13, 2011.[13]

---

disclosure would not jeopardize institutional security. ECF No. 105 at 1-2. Thereafter, the court granted plaintiff's request to take judicial notice of the document in assessing the pending motions for summary judgment. See ECF No. 118. The court noted in pertinent part that, while "the summaries therein of statements reportedly made by plaintiff and defendant in 2011 may not be used to prove the truth of the matters asserted, see Fed. R. Evid. 801(c) (definition of hearsay), they may be used to assess the consistency of each party's current testimony, see Fed. R. Evid. 801(d) (statements that are not hearsay)." Id. at 2-3.

[13] The Confidential Supplement provides in full, ECF No. 109 at 6:

> Synopsis of Allegation: Inmate Heilman alleged in his complaint that CCI T. Wasko made inappropriate and unprofessional comments to him in the Facility B Corridor, threatening to have him transferred for personal reasons.
>
> Findings: When I interviewed Heilman on November 30, 2011, he was unable to provide any information to corroborate his complaint. He was unable to provide any information that would help identify any inmate or staff witnesses to the event. I interviewed CCI Wasko on December 1, 2011. CCI Wasko recalled the incident and said Heilman came up behind him quickly and he actually felt threated by Heilman. Wasko told him to watch his behavior, he had already had Heilman transferred off his caseload. Wasko stated he has always treated Heilman in a professional manner but he has documented several occasions where Heilman became angry and agitated when speaking to Wasko. A review of Heilman's central file shows three instances documented by CCI Wasko detailing Heilman becoming angry and threatening toward him.
>
> Conclusion: There is no corroboration to inmate Heilman's allegations. There is no evidence CCI Wasko violated any policies or procedures.

- The Board of Parole Hearings subsequently considered the RVR (and its reduction to a Form 128-A) when addressing plaintiff's need to be respectful of correctional staff.  See Pl. MSJ, Ex. A, ECF No. 95 at 53-61.

Plaintiff initiated this action on July 26, 2012, by filing the operative complaint.  See ECF No. 1.  On screening the complaint pursuant to 28 U.S.C. § 1915A, the court found that plaintiff failed to state a cognizable claim against any named defendant except Wasko.  Plaintiff was granted leave to file an amended complaint, but did not do so.  The court ordered service of the complaint only on defendant Wasko, on plaintiff's claim that defendant violated plaintiff's First Amendment right to utilize the prison grievance system by issuing the three above-noted 128-B Chronos and the October 28, 2011 RVR, in retaliation for plaintiff's successful challenge to the length of time defendant accorded plaintiff to conduct an Olson review on August 29, 2008.  See ECF No. 13.

By findings and recommendations issued September 13, 2013, ECF No. 32, and order filed December 18, 2013, ECF No. 36, the court granted defendant's motion to dismiss plaintiff's retaliation claims premised on the three Forms 128-B, due to plaintiff's failure to administratively exhaust those claims.  This action then proceeded only on plaintiff's claim that defendant issued the October 28, 2011 RVR in retaliation for plaintiff's September 5, 2008 grievance.

Following a lengthy period of discovery and resolution of the parties' several discovery disputes, both parties moved for summary judgment on the merits of plaintiff's retaliation claim.  Defendant contends in the alternative that he is entitled to qualified immunity.

IV.  Analysis

Plaintiff's motion for summary judgment requires the court to determine whether the undisputed facts compel findings that: (1) defendant issued the subject RVR (2) because of (3) plaintiff's protected First Amendment activities, and defendant's challenged conduct (4) chilled plaintiff's First Amendment activities or otherwise resulted in direct and tangible harm to plaintiff, and (5) did not reasonably advance a legitimate correctional goal.  See Rhodes, 408 F.3d at 567-69.  Defendant's motion requires the court to determine whether plaintiff has produced sufficient evidence to proceed to trial on those issues.  Although defendant is entitled to the

1    benefit of the doubt as the non-movant in responding to plaintiff's motion for summary judgment,

2    in deference to plaintiff's pro se status the court has assessed the evidence with all reasonable

3    inferences drawn in plaintiff's favor as the non-movant in responding to defendant's motion.  See

4    Walls, 653 F.3d at 966.

5         This case turns on the second and fifth Rhodes factors, which are closely related.  The

6    questions are: (1) whether the RVR was issued "because of" plaintiff's protected conduct, i.e.

7    retaliatory motive, and (2) whether the RVR failed to reasonably advance a legitimate

8    correctional goal.  The other elements of the claim are essentially undisputed.  Plaintiff plainly

9    engaged in activities protected by the First Amendment, including his active pursuit of

10   administrative grievances and civil litigation.  Although plaintiff has submitted no evidence

11   demonstrating that his First Amendment activities have been chilled, the parties do not dispute

12   that the subject RVR issued by defendant in October 2011 resulted in plaintiff's placement in the

13   ASU and his ultimate transfer from CMF, consequences adverse to plaintiff.  Plaintiff has also

14   submitted evidence demonstrating that the Board of Parole Hearings subsequently considered the

15   RVR (and its reduction to a Form 128-A) when addressing plaintiff's need to be respectful of

16   correctional staff.  These undisputed facts establish that defendant took an adverse action against

17   plaintiff that caused him direct and tangible harm.  See Rhodes, 408 F.3d at 567-68.

18        A.  Retaliatory Motive

19        Construed most favorably to plaintiff, the evidence establishes that defendant Wasko

20   knew on August 29, 2008, that plaintiff would be filing a grievance against him.  According to

21   the inmate grievance that was submitted on September 6, 2008, when plaintiff asked Wasko for

22   additional time to conduct his Olson review, Wasko told plaintiff "to file a staff complaint 602

23   appeal."  When plaintiff said he intended to do so, defendant replied, "'Go ahead, you'll lose

24   anyway!'"  ECF No. 107 at 5, 26-32.

25        The parties dispute whether defendant's comment conveyed hostility to plaintiff's

26   exercise of his rights.  Defendant avers that "[i]t is my regular practice to encourage inmates to

27   submit grievances to formally address any issue they believe has adversely affected them."

28   Wasko Decl. ¶ 14.  While a jury might well conclude that Wasko's "encouragement" to document

21

1    the grievance did not imply any hostility toward plaintiff, for purposes of summary judgment the

2    court will draw the contrary inference in plaintiff's favor.  In any event, defendant knew by

3    September 23, 2008, when CC-II Taylor interviewed him regarding plaintiff's <u>Olsen</u> review, <u>see</u>

4    ECF No. 107 at 26, that plaintiff had in fact filed a grievance.

5            The allegedly retaliatory RVR, however, was filed a full *three years later*.  The passage of

6    that much time dissipates whatever inference of a retaliatory motive might otherwise arise from

7    defendant's comments of August 29, 2008.  <u>See</u> <u>McCollum</u>, 647 F.3d at 882 (nearly three year

8    gap between prisoner's complaint and allegedly retaliatory action does not support inference of

9    motive).

10           Plaintiff's evidence of defendant's hostility to him in the interim does not support a

11   reasonable inference of a continuing retaliatory animus.  Following the <u>Olsen</u> review dispute, *well*

12   *over a year* passed before plaintiff and defendant's next documented interaction of any kind.

13   That was the December 10, 2009 classification committee review at which plaintiff, according to

14   defendant's contemporaneous written account of the meeting, behaved disruptively and expressed

15   personal animosity towards defendant.  ECF No. 97-6 at 16, Df. Ex. B-2.  Plaintiff's deposition

16   testimony contradicted Wasko's account of plaintiff's conduct at the December 29, 2009

17   classification review, but plaintiff has pointed to no evidence supporting an inference that

18   Wasko's alleged misrepresentations about his behavior had any relation to the previous <u>Olsen</u>

19   review dispute.

20           Following the December 2009 classification committee meeting, *another year and a half*

21   passed before the series of events related to plaintiff's scheduled court calls and the escalating

22   conflict between plaintiff and defendant which caused defendant to document his growing fears

23   for his safety.  The parties' evidence regarding the events of June through October 2011 presents

24   some factual disputes, to be sure: plaintiff testified that defendant explicitly and negatively

25   referenced plaintiff's lawsuits against prison officials while refusing to facilitate his court calls,

26   Pl. Depo. At 30-1; defendant avers, as he wrote in contemporaneous chronos, that he asked to be

27   relieved from supervising plaintiff's court calls due to plaintiff's aggressiveness toward him,

28   Wasko Decl. ¶ 23.  This dispute is not material to the issue of defendant's motivation in filing the

1   RVR on October 28, 2011, which was precipitated by a hallway confrontation in which defendant

2   felt threatened.  ECF No. 97-6 at 19, Df. Ex. B-5.

3        Even if, crediting plaintiff's evidence and drawing all inferences in his favor, the

4   escalating antagonism between plaintiff and defendant in 2011 included hostility by defendant to

5   plaintiff's grievance and litigation activity, that would not reasonably support the separate and

6   necessary inference that issuance of the RVR itself was substantially motivated by hostility

7   toward plaintiff's exercise of First Amendment rights.  See McCollum, 647 F.3d at 882.  The

8   RVR documented defendant Wasko's belief that he was being stalked and that plaintiff presented

9   a direct threat to his safety.  Even if Wasko was wrong about the threat that plaintiff posed, or if

10  the conflict between them which led to the threat had been fueled by plaintiff's anger over

11  thwarted constitutional rights, the reporting of the threat cannot be considered retaliatory unless

12  defendant's reported fear of plaintiff was pretextual.  See id. (circumstantial evidence of motive

13  may include evidence that defendant's reasons for the challenged action were pretextual).

14       Plaintiff points to the RVR itself, in which defendant noted that "Heilman is almost

15  notorious at CMF for his ability to win appeals on the RVR's that he receives.  Heilman's EOP

16  level of care is almost deceiving, considering the level of intelligence he possesses, which is

17  clearly displayed in the lawsuits and appeal papers that he continuously files."  ECF No. 97-6 at

18  19, Df. Ex. B-5.  Taken in context, this acknowledgment by defendant of plaintiff's notoriety as a

19  litigator does not support an inference that this notoriety was the motivating reason for issuance

20  of the RVR or that defendant's expressed concern for his safety was insincere.  Defendant

21  explains:

22         An inmate's mental health and comprehension of the disciplinary
       process must be considered in adjudicating a RVR.  For this reason,
23         I documented that plaintiff's level of mental health care was almost
       deceiving, considering the level of intelligence he possesses, which
24         is displayed by the lawsuits and grievances he files.   [¶] . . .
       Although plaintiff was in the EOP program, I recall he was more
25         articulate and able to comprehend the rules and procedures to
       circumvent and challenge RVRs than most other EOP inmates I
26         encountered.  I therefore believed this information was relevant to
       his RVR.   [¶]   Additionally, as his Correctional Counselor, I
27         remembered removing several RVR's from plaintiff's central file
       after he successfully challeng[ed] them on technicalities.  For this
28         reason, I documented in the body of the RVR that plaintiff was

1

2

> almost notorious at CMF for his ability to win appeals on RVRs that he received.  I believed that his information was also relevant for the evaluation of his RVR, because it showed plaintiff understood the disciplinary process.

3

4   Wasko Decl. ¶¶ 39-41 (internal citations omitted).  Defendant's explanation is consistent with the

5   relevant prison regulations,[14] and plaintiff's contrary interpretation of the RVR rests entirely on

6   speculation.

7         The court need not, on summary judgment, draw inferences in plaintiff's favor that are not

8   reasonably supported by the evidence.  The undersigned finds that the record does not support a

9   reasonable inference of retaliatory motive.  Even if there were a triable fact as to motive,

10  however, defendants would be entitled to summary judgment for an independent reason: plaintiff

11  has not produced evidence sufficient to support a finding that defendant's filing of the RVR failed

12  to advance legitimate correctional goals.  The court now turns to that issue.

13        B.  Legitimate Correctional Goal

14        Regarding the fifth <u>Rhodes</u> factor, the Ninth Circuit has "made clear that the prisoner

15  plaintiff 'bears the burden of pleading and proving the absence of legitimate correctional goals for

16  the conduct of which he complains.'"  <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1289 (9th Cir. 2003)

17  (quoting <u>Pratt</u>, 65 F.3d at 806).  "[A] successful retaliation claim requires a finding that the prison

18  authorities' retaliatory action did not advance legitimate goals of the correctional institution or

19  was not tailored narrowly enough to achieve such goals."  <u>Pratt</u>, 65 F. 3d at 806 (citations and

20  internal quotation marks omitted).  Accordingly, evidence that defendant's challenged conduct

21  was motivated by a legitimate correctional goal will defeat a retaliation claim.  <u>Barnett</u>, 31 F.3d at

22  816.

23        Reporting a potential threat to staff safety indisputably serves a legitimate correctional

24  goal.  <u>Id.</u> ("preserving institutional order, discipline, and security are legitimate penological goals

25  that, if they provide the motivation for an official act taken, will defeat a claim of retaliation.").

26  Defendant has submitted substantial evidence demonstrating that his issuance of the subject RVR

27

---

28  [14]  <u>See, e.g.</u>, 15 CCR §§ 3315(d)(2)(A)(3) & (E)(2), 3317, 3375(g)(4)(A).

24

1    was motivated by the legitimate correctional goals of protecting defendant's personal safety and

2    preserving institutional security.  As indicated above in discussion of retaliatory motive,

3    plaintiff's characterization of defendant's security concerns as pretextual lacks evidentiary

4    support.

5           Defendant was assigned to work in CMF's EOP unit, which houses inmates with serious

6    mental illnesses.  Plaintiff was assigned to the EOP unit and to defendant's caseload in May 2008.

7    As a Correctional Counselor, defendant was required to be knowledgeable about the inmates on

8    his caseload, and to routinely record relevant information concerning each inmate's behavior for

9    purposes of classification and parole.  Wasko Decl. ¶¶ 1-4, 7.  Defendant states that, reviewing

10   plaintiff's file, he learned that plaintiff was serving time on a first degree murder conviction, id. at

11   ¶¶ 5-8, implying that defendant thereafter considered plaintiff a higher security risk.  Between

12   December 2009 and August 2011, defendant recorded plaintiff's disruptive behavior on three

13   separate General Chrono Forms 128-B.  Defendant's concerns for his personal safety and ability

14   to maintain institutional security are clearly stated throughout this 18-month period:

15   •   On December 10, 2009, entitled "Conduct Which Could Lead to Violence," defendant
         reported that, at plaintiff's annual classification hearing held the same date, plaintiff
16       called defendant "a piece of shit," said he "didn't like" defendant and didn't want
         defendant present at the hearing or involved in the preparation of plaintiff's parole
17       board report; plaintiff disobeyed both of defendant's direct orders to sit down, and
         CC-II Taylor needed to intervene.   See ECF No. 97-6 at 16, Df. Ex. B-2.
18

19   •   On July 20, 2011, entitled "Disruptive Behavior," defendant reported that, at the time
         scheduled for plaintiff's July 18, 2011 court call, plaintiff was hostile toward
20       defendant, accused him of being unhelpful, and told him that plaintiff had filed a
         complaint against defendant with the court; plaintiff reportedly "rose to his feet, flung
21       [defendant's] office door open and began yelling down the tier for the Wing Officer to
         come his assistance;" then plaintiff reportedly told CO Franco that defendant "was
22       harassing him and that he needed a witness."  See ECF No. 97-6 at 17, Df. Ex. B-3.

23   •   On August 12, 2011, entitled "Staff Safety Concerns," in response to an August 10,
         2011 email from the CMF Litigation Coordinator scheduling another court call for
24       plaintiff, defendant requested that he not be required to supervise the call and that
         plaintiff be moved off defendant's caseload.  Defendant stated that he felt he could not
25       "safely perform the court call or any other functions related to my job in the presence
         of I/M Heilman;" that plaintiff routinely responded to defendant by becoming "loud
26       and verbally aggressive," and "often rises to his feet, flailing his arms around and
         pointing his fingers at me as he threatens to file lawsuits and appeals against me;" that
27       plaintiff "continuously refuses to follow my verbal orders to cease his disruptive
         behavior;" that "[e]ven when the use of force was clearly warranted to stop his
28       behavior and gain compliance . . . . I refrained from using force;" and that plaintiff
         "has told me before that he does not like me and his behavior towards me is a clear

25

indicator of that."  Defendant concluded:  "Considering Heilman's commitment offense for PC 187 Murder 1° combined with his mental health issues, and obvious animosity towards me, I am requesting that Heilman be moved to an EOP bed that is not in my immediate work area . . . . I do not feel safe in the presence of Heilman, and in the interest of institutional safety and security, for both myself and I/M Heilman, I recommend that this request be granted."  See ECF No. 97-6 at 18, Df. Ex. B-4.

Defendant prepared the subject RVR two months later.  After the parties' encounter on October 28, 2011, defendant initially recorded plaintiff's behavior in a "Multi-Purpose Work Sheet 115/128," id. at 19, Df. Ex. B-5, which was later set forth in the subject RVR.  He stated in pertinent part:

> I believe Heilman's behavior towards me is escalating to the point that a violent confrontation between us is imminent.  I have previously documented disruptive threatening behavior by Heilman towards me (128B's 12/10/09, 7/18/11, 8/10/11) and requested that he be removed from my caseload in an effort to eliminate any potential future hostilities. . . . [M]y concerns were not taken seriously and it now appears that my initial concerns were underestimated as Heilman thinks that stalking me and advancing aggressively towards me in the hallway is acceptable and tolerable behavior.  Heilman's actions this morning were an obvious attempt to intimidate me at the minimum. . . . [and] have convinced me that he is a threat to my safety and the only way to eliminate that threat is to transfer him. . . . I absolutely do not feel that I can safely perform my duties at CMF with Inmate Heilman walking the mainline.  I have unsuccessfully made every attempt I can possibly make to avoid future conflicts which I've been trying to avoid.

Id.

Defendant also noted that "it appears an opportune time to transfer Heilman" due to the "recent CMF/EOP conversion of L-Tower to a DMH-ICF program, which requires reduction of the current EOP population."  Id.

CMF staff responded immediately to defendant's concerns.  In response to the RVR, plaintiff was placed in the ASU on the afternoon of October 28, 2011.  On November 2, 2011, the Institutional Classification Committee (ICC) determined that plaintiff would be "retained in ASU pending the adjudication of the RVR and the resolution of staff safety concerns at CMF."  ECF No. 1 at 86.  The hearing on the RVR was held November 17, 2011, pursuant to which Lt. Thomas reduced the RVR to an Administrative Chrono Form 128-A.

Despite the reduction of charges against plaintiff, defendant continued to express concern.

26

On November 29, 2011, defendant emailed CC-II J. Zometa, who worked with the "Psych ASU caseload," and stated that "[t]he fact that the RVR was reduced to a 128A does not change my belief that *Heilman is a threat to my safety*. Please keep me advised if administration plans to release Heilman from ASU." See ECF No. 1 at 84 (Compl., Ex. H); ECF No. 107 at 50 (original emphasis).

Other CMF staff and administrators continued to view plaintiff's concerns seriously. On December 21, 2011, the ICC – comprised of CMF Warden Singh, CMF Associate Warden Arnold, Facility Captain J. Walker, and Staff Psychologist Dr. Minor, with CC-II J. Zometa acting as Recorder – concluded that plaintiff should be retained in the ASU based on their finding that plaintiff "has demonstrated a pattern of harassment and threatening behavior towards CCI Wasko . . . . CCI Wasko continues to have personal safety concerns with Inmate Heilman, and feels threatened by his presence at CMF. ICC concluded that Inmate Heilman should not be allowed to remain at CMF. Therefore, Committee agreed to retain Subject in ASU due to staff safety concerns and refer the case to the CSR for transfer consideration." Id.

In the Confidential Supplement, dated December 21, 2011, rejecting plaintiff's staff complaint concerning the parties' hallway encounter, Lt. Ross noted that he had interviewed both parties and reviewed plaintiff's central file which "shows three instances documented by CCI Wasko detailing Heilman becoming angry and threatening toward him." See ECF No. 109 at 6. Lt. Ross found "no corroboration to inmate Heilman's allegations," and "no evidence CCI Wasko violated any policies or procedures." Id. The supplement was approved by CMF Warden Singh. Id.

In his written decision issued January 9, 2012, Lt. Thomas found that, although the RVR was reduced to a Form 128-A, "there appears to be a pre-existing adversary relationship" between parties; that plaintiff "used poor judgment" when he "elected to take advantage of the opportunity to create the element of surprise for staff;" and that Lt. Thomas was "convinced [plaintiff ] had full knowledge his behavior would produce a startled effect on staff." ECF No. 107 at 43. The decision was approved by Facility Captain J.R. Walker and CMF Associate Warden D. Arnold. Id.

Although plaintiff contends that defendant's stated safety concerns were pretextual,[15] the circumstances do not support a rational inference of pretext. Defendant's evidence, taken as a whole, firmly supports defendant's assertions that he felt personally threatened by plaintiff, that he felt more threatened over time, and that he was concerned whether he could maintain institutional security in plaintiff's presence. Significantly, defendant's evidence includes the decisions and reasoning of his superiors in deferring to defendant's safety and security concerns by deciding that plaintiff should be transferred to another institution and remain in the ASU pending his transfer. These decisions objectively validate defendant's concerns,[16] and thus demonstrate that the subject RVR was supported by legitimate correctional concerns.

In evaluating a retaliation claim, the court is required to "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt, 65 F.3d at 807 (quoting Sandin, 515 U.S. at 482 ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment" (citations omitted)). "Security, of course, is the paramount concern of prison administrators. As the Supreme Court has noted: 'The essence of a correctional counselor's job is to maintain prison security.'" Teamsters Local Union No. 117 v.

---

[15] Plaintiff asserts that defendant's alleged retaliatory motive for issuing the RVR is demonstrated by defendant's failure to implement immediate security measures at the time of the incident and his five-to-six hour delay in submitting the RVR. Plaintiff notes that, at the time of the incident, defendant did not implement any protective measures demonstrating that he feared for his safety, e.g., seeking the assistance of other staff, activating a personal alarm, blowing a whistle, commanding plaintiff to move away or get down, or detaining plaintiff. See ECF No. 107 at 11. In response to plaintiff's interrogatories on these matters, defendant responded that he "did not claim plaintiff 'physically' threatened him" during the incident but took the action he believed "necessary to protect his safety." See ECF No. 84 at 107-08 (Plaintiff's Interrogatory No. 23, and Defendant's Answer thereto). Defendant also responded that he informed Captain Walker of his concerns "as soon as the incident was documented." Id. at 108 (Defendant's Answer to Plaintiff's Interrogatory No. 24).

[16] Moreover, defendant's requests and the administrative decisions supporting them were narrowly tailored to achieve the legitimate objectives of ensuring defendant's safety and maintaining institutional security. See Pratt, 65 F.3d at 806 (defendant's challenged conduct will overcome a retaliation claim if it advanced a legitimate correctional goal that was tailored narrowly enough to achieve the goal); see also Turner v. Safley, 482 U.S. 78, 89 (1987) (test for determining whether a prison regulation that impinges on an inmate's constitutional rights is valid because reasonably related to legitimate penological interests).

1    Washington Dept. of Corrections, 789 F.3d 979 (9th Cir. June 12, 2015) (quoting Dothard v.

2    Rawlinson, 433 U.S. 321, 335 (1977)) (further citation omitted).  "[I]nstitutional security . . . is

3    'central to all other corrections goals.'"  Hudson v. Palmer, 468 U.S. 517, 527-28 (1984) (quoting

4    Pell v. Procunier, 417 U.S. 817, 823 (1974).

5          Plaintiff is unable to demonstrate that defendant's challenged conduct was "arbitrary and

6    capricious" or "unnecessary to the maintenance of order in the institution," which he must

7    establish in order to prevail.  Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012).  Even if

8    plaintiff's evidence demonstrates that defendant may have been motivated in part by frustration

9    with plaintiff's exercise of First Amendment rights, plaintiff has failed to meet his burden of

10   demonstrating a triable issue of fact whether defendant's issuance of the subject RVR advanced a

11   legitimate correctional goal.  Defendant's evidence demonstrating that his challenged conduct

12   was motivated by, and narrowly tailored to achieve, legitimate correctional goals, in the absence

13   of evidence that defendant acted arbitrarily or capriciously, defeats plaintiff's retaliation claim on

14   summary judgment.  Barnett, 31 F.3d at 816; Watison, 668 F.3d at 1114-15.

15         For these reasons, the court recommends that plaintiff's motion for summary judgment be

16   denied, and defendant's motion for summary judgment be granted.[17]

17   V.  Conclusion

18         For the reasons set forth above, IT IS HEREBY ORDERED that:

19         1.  Defendant's motion to strike, ECF No. 99-2, is denied as moot, see footnotes 3 and 5,

20   supra.

21         Further, IT IS HEREBY RECOMMENDED that:

22         1.  Plaintiff's motion for summary judgment, ECF No. 95, be denied;

23         2.  Defendant's motion for summary judgment, ECF No. 97, be granted; and

24         3.  Judgment be entered for defendant.

25         These findings and recommendations are submitted to the United States District Judge

26   _____

27   [17]  When a court decides that plaintiff's allegations do not support a constitutional violation, it
     need not reach defendant's qualified immunity defense.  Saucier v. Katz, 533 U.S. 194, 201
     (2001).

28

1  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

2  after being served with these findings and recommendations, any party may file written

3  objections with the court and serve a copy on all parties.  Such a document should be captioned

4  "Objections to Magistrate Judge's Findings and Recommendations."   The parties are advised that

5  failure to file objections within the specified time may waive the right to appeal the District

6  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7  DATED: August 10, 2015

8

ALLISON CLAIRE

9  UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28